**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | No. 15-17031 |
| Plaintiff-Appellant, | D.C. No. 3:14-cv-00134-HDM-VPC |
| v. | |
| JOHN RUHS, Nevada State Director; BUREAU OF LAND MANAGEMENT, an agency of the United States; U.S. DEPARTMENT OF THE INTERIOR, an agency of the United States, | MEMORANDUM[*] |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Nevada
Howard D. McKibben, District Judge, Presiding

Argued and Submitted April 20, 2017
San Francisco, California

Before: REINHARDT and BERZON, Circuit Judges, and AMON,[**] Chief District
Judge.

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Carol Bagley Amon, Chief United States District
Judge for the Eastern District of New York, sitting by designation.

Western Watersheds Project ("WW") appeals the district court's grant of summary judgment in favor of the United States Bureau of Land Management ("BLM") in WW's action challenging BLM's issuance of a final Cave Valley and Lake Valley Watersheds Restoration Plan Environmental Assessment ("EA"), which sought to reduce fire risks and improve habitats for greater sage-grouse by removing trees and vegetation in eastern Nevada. WW argues that the EA violates the National Environmental Policy Act ("NEPA") by failing to take a "hard look" at the Restoration Plan's potential effects on the greater sage-grouse and its habitat, by inadequately considering the cumulative impacts of the Restoration Plan with past, present, and future projects in and around the project area, and by failing to analyze the potential impacts of the project's rangeland improvements. Because WW has not shown that the EA is deficient under NEPA, we affirm.

We review the district court's grant of summary judgment de novo. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). Because judicial review of agency decisions under NEPA is governed by Section 706 of the Administrative Procedure Act, we will uphold the agency's action "unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). Our review "is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Responsible Res.*

*Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008). "[W]e must defer to an agency's decision that is 'fully informed and well-considered,'" but we will not overlook "a 'clear error of judgment.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (first quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988); then quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

**1.**     We first find unpersuasive WW's claim that BLM violated NEPA's requirement to take a "hard look" at the Restoration Plan's cumulative environmental impacts. NEPA requires that an EA's cumulative impacts analysis include "a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects[ ] and differences between the projects" might impact the environment. *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005). BLM has met this standard.

The EA tiers to prior NEPA analyses in the Ely Proposed Resource Management Plan ("RMP")/Final Environmental Impact Statement ("FEIS") and the Final Programmatic Environmental Impact Statement on Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States ("Vegetation PEIS"). These documents discuss the potential cumulative impacts of activities occurring within the Ely District, including "[c]onservation plans for greater sage-grouse," as well as "large, regional-scale

3

trends and issues" related to chemical treatments, prescribed fire, and mechanical treatments and their effects on vegetation. Because these prior analyses cover larger regions, they note that site-specific analyses will be necessary in future projects covering more narrowly defined areas. WW argues that BLM failed to provide such site-specific analysis in the Restoration Plan's EA. We disagree.

The EA discusses projects occurring within and around the Restoration Plan's project area. Within the EA's "Cumulative Impacts" section, the EA explicitly states that BLM reviewed a prescribed "Cumulative Effects Study Area," which includes "the entire Cave Valley and Lake Valley Watersheds and nearby areas within the surrounding watersheds." The EA discusses several current and future plans, many of which could affect sage-grouse and its habitat.

The EA also addresses potential effects of the Restoration Plan on sage-grouse and its habitat. The document makes clear that a goal of the Restoration Plan is the "[i]mprove[ment of] sage grouse habitat," and concludes that sage-grouse would benefit from the project. The EA recognizes possible harms to sage-grouse and implements its own mitigation measures to address these harms and to support its conclusions concerning potential impacts.

The EA also provides a chart analyzing the desired future condition ("DFC") of sagebrush—the primary habitat and source of food for sage-grouse—compared to current condition percentages and the current condition percentages' differences

4

from the DFC within the Cave and Lake Valley Watersheds. The EA demonstrates how the proposed action's resulting percentages concerning sagebrush conditions would be an improvement from current condition percentages within the project area, moving the condition of sagebrush closer to the DFC. The EA states that the analysis of the impacts of the proposed action is based on the assumption that the objectives for the treatment units would be met through the implementation of the Restoration Plan's primary or adaptive management actions, and explains that it is reasonable to expect that the objectives would be met based on the results from past treatments.

WW argues that the EA does not address the cumulative impacts of two past projects that occurred within small areas of the Restoration Plan's project area, the Lincoln County Sage Grouse Habitat Restoration Project and the South Spring Valley Sagebrush Habitat Restoration Project. We find WW's arguments unavailing, because the EA considers those projects' impacts in its aggregated review of past actions. Further, in those projects' NEPA analyses, BLM recognized that the projects' impacts could initially be harmful to sage-grouse habitat but concluded that the projects' activities would benefit sagebrush communities in the long-term.

Furthermore, although the prior projects adopted annual monitoring regimes to study the effects of their actions on sagebrush—actions which are identical to

5

those proposed in the Restoration Plan—any data collected between the time those projects were implemented and the Restoration Plan's EA was issued could not have accurately evaluated BLM's projected results of those prior actions. The Restoration Plan's EA was issued four years after the initiation of the Lincoln County and Spring Valley Projects. Studies have shown that it can take fifteen years using reseeding to restore such ranges with the appropriate subspecies of sagebrush and herbaceous species. The projections in the Spring Valley Project's NEPA analysis similarly anticipated that any increase to perennial grasses and forbs would occur within "5 to 10 years following completion of the proposed treatment." In the absence of evidence by WW demonstrating that early monitoring would nonetheless have been useful, the Court finds that BLM's failure to monitor the earlier projects did not render the Restoration Plan's NEPA analysis inadequate.

BLM also did not violate NEPA by failing to analyze the cumulative effects of the future Hamblin Valley Watershed Restoration Plan. Although agencies generally must address the cumulative impacts of reasonably foreseeable future projects in a current project's cumulative impacts analysis, a court can in some cases defer to the agency's on-the-record commitment to address the combined cumulative impacts of both projects in the future project's cumulative impacts analysis. *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 980 (9th Cir.

2006). BLM has represented to the Court that it will analyze the cumulative impacts of the Restoration Plan combined with those of the Hamblin Valley project in the latter's own cumulative impacts analysis, and it will be held to that commitment. *See Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1357 (9th Cir. 1994). We therefore find no violation.

**2.**     WW's second challenge to the EA on appeal is that BLM violated NEPA by approving a series of rangeland improvement projects as part of the Restoration Plan without first taking a "hard look" at the direct ecological consequences on sage-grouse of building the projects. WW's arguments fail. Pursuant to NEPA's "hard look" requirement, an agency must prepare an up-front, coherent, and comprehensive environmental review, *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citations omitted), and "vague and conclusory statements, without any supporting data" will not be sufficient, *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006). The EA meets this standard. The EA provides an adequate baseline analysis of the current conditions of sage-grouse and sagebrush within the project area. Further, the EA provides a comprehensive environmental review of the impacts of the Restoration Plan's intended rangeland developments. The EA discusses potential negative impacts to sage-grouse and provides mitigation measures specific to the rangeland projects. The EA demonstrates that the long-term effect of the rangeland

improvements will be beneficial to wildlife, with only minor short-term harms, which are limited by mitigation measures. BLM's analysis of the rangeland improvements therefore complied with NEPA.

**AFFIRMED.**